With our reconstituted panel, we will take the next case of the morning, Glass v. Paxton. May it please the Court. Only broadly speaking is this case about Texas's concealed carry policy and legislation for public university campuses. Rather, it is about a subset of that policy, the so-called guns in the classroom policy, which is part of the broader policy of concealed carry for weapons on campus. On behalf of the three University of Texas professors who are appellants here, I want to focus on only a part of the subset of the challenge. And that is the only part that was addressed below, which is standing of these plaintiffs, these professors, to lodge their First Amendment challenge against the compelled guns in the classroom policy. I want to address it in order of three things. The big issue is standing, but first I want to say what is the policy, briefly, and what is the challenge, and then what is the test for standing. And I hope to cover the first two very briefly. What is the policy about guns in the classroom? The policy is that students at the University of Texas and any other public university campus, not private universities, but students at the University of Texas at Austin, are allowed to carry concealed guns that are loaded onto the campus. They have to keep them concealed, but they can carry them onto the campus and they can carry them into the classrooms. Let me ask you just about that. Under the statute, I assume all the public universities have had to do this, the policy we're talking about only applies to the University of Texas system? So Texas A&M and others, though not part of this case, would have had to develop their own policies? They developed their own policies, and frankly, Your Honor, I don't know all of the details on their policies. I'm not trying to get those, but we're just talking about the University of Texas system, not Austin per se, but throughout. Yes, but since this is a standing issue, we've got three professors at the University of Texas at Austin that are asserting this claim. But let me say, this policy applies more broadly in an attorney general opinion, or at least has been said to apply more broadly. In an attorney general opinion, KP-51, which came out shortly after the statute was passed, the attorney general said the statute says nothing about compulsion to allow loaded guns in the classroom. But he concluded that because of the prohibition in the legislation that says you can't have a general prohibition on carrying on campus, that the result of that, the logic of that is you have to allow guns in the classroom. Otherwise, you would have a general policy against guns on campus, concealed carry. So in other words, the state is no longer forbidding students from bringing guns. They're now allowing it. Is that what you're saying? They're allowing that. That's the first part of the policy. The second part of the policy, which I was going to get to after mentioning KP-51 and what it's focused on, is the other part of the policy is professors cannot prohibit those students from carrying loaded weapons into their classroom. That's a two-part policy. So the professors can't say, I don't want you to bring guns in here, or you may not bring guns in here. In fact, there's a memo sent out just before the policy was to be implemented with the semester starting that said you may not even discourage students from bringing loaded guns into your classroom. So the prohibition on the professors saying you may not bring or please don't bring guns into my classroom is the main focus of our policy because this brings me to what is the challenge here. The challenge by these three professors is we aren't challenging the broad policy of guns on campus. We aren't even challenging the broad policy of guns in the classroom. What we are challenging is the prohibition on us exercising our own individual option to say not in my classroom. You may not bring them into my classroom. So other professors may have different views, may be perfectly comfortable with it. I think the suggestion is a lot of them aren't because of the UT faculty position on this. But nonetheless, this is just for these three professors saying we want the option to say we do not want you to bring guns into our classroom and you may not bring guns into our classroom. So that's the focus of their challenge on that policy. So what happens if a professor violates that policy? They are subject to, there was quite a bit of debate about this actually at the preliminary injunction hearing. But it looked like for a while that there was no consequence from saying you may not. But the university then insisted yes, we may bring the full weight of disciplinary procedures down on you. It's in the handbook. I honestly don't remember the number right now. It seems like it's 30108 in the University of Texas policies. It's in the brief but I don't remember the exact citation to it. But they can be disciplined by university officials and it can be up to and including discharge if they violate that policy. So they face consequences here if they exercise the option they want to exercise, which is don't bring guns into my classroom. What is their First Amendment challenge about this? How is the First Amendment implicated by this? We have declarations from the three professors. We have extensive allegations in the amended complaint about the consequences of this for First Amendment purposes. And that is the professors say from their long experience, and all of them have a lot of experience, that they engage in extensive, robust classroom debate. That's the way they test things in their classroom. They like to push the limits. They teach controversial classes, issues about reproductive rights, issues about gay rights, other issues. One teaches Virginia Woolf, which I don't think is that controversial, but some people don't like her. But anyway, so they have, they believe and they think in their classroom in the exercise of academic freedom, they should be teaching a robust set of, have robust intellectual discussion among the students. They say this policy where we don't know who's carrying a gun, a loaded gun in the campus, in our classroom, will close the spectrum down of how much debate there will be in the classroom. So it's not a specific content-based restriction. It is a restriction on the amount of academic debate and freedom that's exercised in the classroom. And this, as I said, there are declarations in there, I should have included in the record excerpts, and I didn't, but they're in the record, that talk about this. Is your argument basically that the possibility of guns in the classroom brought by a student, that that's what chills the discussion? Yes. It's the act of the student? No, it's the policy that keeps the professors from saying you can't bring a gun in because they can't know on any given day whether a student is sitting there with a loaded gun or three students are sitting there, whether a nervous student is sitting there with a loaded gun. It's the policy that the university has said you can't exclude them that is the problem because they have to sit there and say somebody out there, and I'm not allowed to know who, has a gun or likely has a gun, and that makes us very nervous. Now, I want to say this is an objectively reasonable reaction of these professors. They aren't wilting violets or hothouse plants. This is a reasonable reaction. What do you do with a case, though? I get your point that if somebody's about to shoot you when you talk, that that's scary. I get that. Here's my question. It's not the government's bringing of the gun that's doing it. It's the student. I'm just establishing what I think is obvious. I just don't agree, Your Honor. The policy forces them to sit there, the professors, to sit there and say, any student that wants to can have a gun in my classroom and it can be loaded. Any student. And I can't know who they are, and I can't tell them don't bring them. I can't say anything about that. And that threat is sitting there, that dread, that threat is sitting there. It's very much like the threat from the NAACP v. Alabama case in 1958 where Justice Harlan's opinion said, the policy is the problem. And the policy is when the state said, we want your list, NAACP, or your membership, whether they intended to curtail First Amendment rights at that point or infringe on them was not the issue. The issue is whether it did, and the dread over on the NAACP v. Alabama side is the same character as the dread here. That is, you don't know, if you're a professor and you're pushing debate, whether you have, it doesn't, you have a student that's on the edge. I guess what I'm trying to say, though, is I know you don't like the, I know your clients don't like the policy, but what's causing the chilling injury is not the policy, it's the act of a third party bringing the gun in the classroom. I just don't agree, Your Honor. The policy leaves it free for people to bring a gun in. Yes. The student can choose whether to bring the gun in. And leaves it free for them not to. You can have the policy and no child, no student can exercise it. That's right. But I don't think the case, there's a case called Munson in 1984, a Supreme Court case, where it said the policy is what creates the problem. Lugar v. Edmonton Oil also says the same thing. The policy is what creates the problem. Just because there may be a third party that may have, be able to take advantage of that policy is not, does not keep you from challenging the policy. The policy leaves you free. Counsel, I certainly understand why you're pursuing this. It does seem to me that the way this was argued and presented and analyzed in the district court was on cases such as Clapper and Laird v. Tatum, which all deal with looking at the actions of third parties. And it's a very difficult hurdle for you to get over. But why don't you try in the four minutes that you have left to deal with that case law and tell us if we are in mind to look at this as the district judge did, how can we look at it in a more favorable way? Well, the debate with me on behalf of the plaintiffs was not Clapper and Laird v. Tatum. That was what the state posited and the court said it used. They are inapposite here because they had to, those were both surveillance programs. Laird was an Army surveillance program. Clapper was surveilling of international phone calls to certain types of people. And the people were denied standing in each instance there because the court said, you've not been surveilled and you have no indication you're going to be surveilled. You have not been. So you don't have standing. If they had been surveilled, they would have had standing in both those instances. So the policy was surveillance. These people had not been affected by the policy. They were worried they might be. Here the policy is you have to let anonymous students sit there with guns in the classrooms they have them and worry about it. And so they are directly affected. It isn't like someday you may be affected by this. But here it's the equivalent of their being surveilled, they being directly affected by the policy. I thought there was actual surveillance in Laird. And the Supreme Court was just simply saying that subjective chill was too attenuated to establish. I don't think that's correct, Your Honor. I think they said you have no indication that you've been surveilled. Here, let me go through just elements of injury in fact, which is the key issue here, it seems to me. Injury in fact, as the Supreme Court said in Spokio, is first and foremost among the three pieces of standing. You have injury in fact, you have traceable to the conduct, which is some of what Judge Ho is questioning about, and then you have redressability. I don't think there's any question about redressability. But I want to focus on injury in fact, which is first and foremost among these. First, the injury has to be concrete. But concrete does not mean you can feel it. The professors do not have to have had a gun waved in their face or see a gun waved in the face of one of their students or be shot to make this claim. Intangible, intangible harms are acceptable, and it only takes an identifiable trifle under the rulings. Intangible harms suffice to establish concreteness in terms of these standings. And here, it is intangible. The national organization said it's a danger. The president of the university said it's a danger to academic freedom. The working group itself in its paper said, we don't think guns belong in the classroom. The faculty council said. So it's objectively reasonable, intangible effect on these people. It's not like Clapper. It's not like Laird versus Tatum. Those are about you might in the future have to be subjected to the surveillance program. We're currently being subjected to the policy we're challenging, and the policy is key. It's not that you're going to be shot. Excuse me. It was Clapper, Amnesty International, that says there's just a series of speculative events. But as the – or it could have been Laird instead. As the court went through it, the final step, though, was that it was an action of a third party, which seems to me in the Supreme Court's view was an independent basis for saying why there was not an injury. I don't think that's correct, Your Honor. I'm sorry. You need not to think it's correct, I guess, to succeed. I know. What I say doesn't matter, right? Well, no, no. I don't mean it that way. Not at all. No. The court said there can be third-party surveillance. You have no evidence there's ever been third-party surveillance of you. And surveillance was the challenged policy. Here I say the policy of saying you can't keep guns out of your classroom is the challenged policy. It isn't being shot. That's not the challenged policy. The challenged policy is I can't say keep guns out of my classroom. And that's not an undifferentiated fear. It's specific as to these plaintiffs, they only are asserting this as to themselves. When you come back, could you point out what part of Laird draws the distinction? Because I'm reading Laird right now, just a refresher in my recollection. It's about an active policy of collecting information by going to events. Just briefly, the policy didn't affect the plaintiffs. That's the thing. The plaintiffs in Laird were not affected by the policy. They were worried that someday they might be subjected to this surveillance. And the court said you've never been subjected to the surveillance. So these people, that's what I keep saying. The surveillance here, there, is equivalent to the policy here. There, if these people had been subjected to the surveillance, they could have had standing. That's all they're saying, standing, not make their claim. May it please the Court. Jason Lafon for Appalese. I'd like to start kind of where the Court just left off, and that's with Clapper. Now, if I could point the Court to page 416 of Clapper. And it says, The Second Circuit's analysis improperly allowed Respondents to establish standing by asserting that they suffer present burdens that are based on a fear of surveillance so long as that fear is not fanciful, paranoid, or otherwise unreasonable. This improperly waters down the fundamental requirements of Article III. That is this case. Plaintiffs self-imposed harm based on a fear of what's going to happen. And they say, well, it's an objective fear. Clapper says that's not enough. Clapper goes on. It says, Respondents' contention that they have standing because they incurred certain costs as a reasonable reaction to a risk of harm is unavailing because the harm Respondents seek to avoid is not certainly impending. In other words, Respondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending. Let me ask you about that. The Court does go on towards the end of the opinion. It made some somewhat qualified statements, it seems to me. In the past, we have been reluctant to endorse standing theories, reluctant to endorse them that require guesswork, how independent decision-makers will act. They then say we decline to abandon that. Rests on speculation. There's an awful lot in your brief. I don't think the district judge's opinion is that lengthy. I don't think he talked about it. Really talk about the speculative nature of this. Does it ever become nonspeculative? We're early in the stages of having, at least legally, guns in the classroom. Would a few shootings change the analysis? Does it become at some stage less speculative? Does it have to happen at the University of Texas, Austin campus by somebody who did have a proper permit? How does this play out in the future if we say you have the right analysis now? Well, for that, Your Honor, I would point this Court to City of L.A. v. Lyons because there the plaintiff was previously subject to a chokehold by L.A. police, and he came to court to challenge their policy on chokeholds. And the Court said you don't have standing because you are not — because it's speculative whether or not you're going to be subject to a chokehold again. It wasn't enough that he had already been subject to one. And the Court said that this is what you would have to do to have standing. It said Lyons would not have had to only allege that he would have had another encounter with police, but also to make the incredible assertion that all police officers in Los Angeles always choke any citizen with whom they happen to encounter, whatever the purpose of the arrest. That's what they would have to allege here. They would have to allege plausible facts that, in fact, they will be shot. And even then, and even then, Your Honor, that would still be lawbreaking by a third party. So we haven't even gotten to the third-party thing. That, I guess, would have been the next question. It seems to me, regardless of the speculative nature of it and the more — the less speculative nature of it, perhaps, as events go along, you still have this independent actor issue. And what I read out of Amnesty International suggests the Supreme Court hasn't necessarily closed the door, but it has not yet recognized the actions of third parties as being able to create standing on the part of the person who fears that person's actions, that unidentified person's actions. So you think there is almost automatically or unalterably the requirement that if the chilling effect is from the possible action of third parties, there cannot be standing? Your Honor, I will say that in some case, if it were guaranteed that the government action would directly cause the third party, then — Start over. I lost you. Sorry. If it were guaranteed that a government policy would definitely lead to a third party, then maybe. But the Court has never endorsed that. What about Meese v. Keene, the propaganda, political propaganda notice that had to be given if you showed certain films? It was the reputational harm to the individual, I think, was the problem. But that harm was being inflicted by third parties who were not in the case. So why distinguish that for me? Sure. Your Honor, I don't — that's not correct. The harm was being inflicted by the Federal government. By the policy. Well, no. The harm — the way that it worked was that his reputation would be harmed. And the only way that matters is if other people care about your reputation. But it wasn't those people causing his reputation to be harmed. It was the government's label of him as a propagandist that was causing the harm. It went in one direction, not the other direction. So even though third parties were necessary for that harm to mean anything, it was still the government. It was not harm without the third parties. It's — right, right. But that doesn't mean that they're causing it, Your Honor. It was the government that was causing it. It was going in one direction. It was not the people out there, the constituents that were causing the harm. And so — Is that what you would say about the membership roles of the NAACP in the Alabama case, or how would you deal with that? Well, as we pointed out, Your Honor, that was not a — that was not a standing case. It was an organizational standing case. The court — the court did not — did not analyze what — what the actions of third parties meant in that case. But even in that case, what the court said was there was such a history of this that it was inevitable, is what the court used, that it would happen again. Here, I mean, even if you take their objectively reasonable standard, they can't satisfy it because all they have — all they've alleged is lots of people have this fear. But lots of people fear flying. That doesn't mean that it's reasonable to think that any plane is going to crash. So the fact that multiple people have this fear, the fact that this has never been a shooting on — in a college that — that allows campus carry based on robust academic debate. So even if you accept that — that part of their theory, it — it can't work. They don't — they haven't alleged an injury in fact. And ultimately, Your Honor, all of the jurisdictional defects in plaintiff's First Amendment claim arise from the same indisputable fact, and that is they can exercise their full panoply of their asserted First Amendment right without risk of violating the campus carry law and policy. If they — if they power through their self-imposed censorship and engage in robust debate, there is no threat that the campus carry law and policy will impose discipline on them. Yeah, that's not the threat they're worried about. It's not. It's not, Your Honor.  Let me ask a opposing counsel, your friend on the other side, I hope has been friendly, indicated that the Attorney General has already, I guess the KP and then the number, that's Ken Paxton and some number of an opinion, has indicated, suggesting, which may well be true, and it seemed to be what this committee decided had to be done, that you basically have to allow guns in the classroom under the statute, that it would be inconsistent with the statute. And so the problem really isn't the policy, it's the statute. Is that a fair reading? Well, Your Honor, the Attorney General's opinion is persuasive in Texas courts. It's not — it's not — it's not the law. I'm not asking for the authoritative nature of it. I'm asking, is that a fair reading of the statute, not a fair reading of what the Attorney General's opinion is? Yes, that's a fair reading, Your Honor. But UT Austin's justification was not that the statute required it. It was that the alternative was having gun lockers outside every classroom and that that was too dangerous. And so that was UT Austin's justification for this. But getting back to standing, Your Honor, if I could just finish up by making two other points on standing, and that is that — well, actually three. The first is that in no case in this Court or in the Supreme Court has a chill on speech without a certainly impending harm been found to satisfy Article III. And if we — if we can look at then-Judge Scalia's opinion for the D.C. Circuit in United Presbyterian Church v. Reagan, Judge Scalia surveyed the Supreme Court case law and concluded that chill is what implicates the First Amendment. It is not by itself enough to satisfy Article III. What you have to have in order to satisfy Article III is a certainly impending harm. And then even if you took plaintiffs' chill as an injury, they would still have a traceability problem because it depends on the acts of third parties. And then finally, even if they could satisfy those two, they have a redressability requirement because their genuine fear is based on lawbreaking. And it is not — it is not likely that allowing them to institute a rule in their classroom is going to cure that genuine fear of lawbreaking. And now, Your Honor, if I could — if I could move on to the — Who controls access to these classrooms? I assume it's the university. It's not the professors. It is. It is, Your Honor. If I could correct a factual misstatement by my friend. He refers to this as if these classrooms belong to plaintiffs. They don't. They belong to the — to the institution. And — What they're asking for is the professors want the government to step in and help them prevent students from coming in with a — with a gun. Right. And the — the irony is that they cite academic freedom for this, whereas this Court has cited academic freedom as a reason that courts do not get involved in university disputes. And so what they're arguing is they want autonomy in their classroom. But if you look at plaintiffs' amicus brief, they acknowledge that this is a matter of a policy. And as the Supreme Court stated in the Minnesota Community College case v. Knight, policy is a matter for the institution. It is not — there is no right for academics to be involved in institutional policy. And so even if this Court were to — were to reach the merits of plaintiffs' First Amendment claim, it would have to reject the claim because their constitutional theory has — has no merit, not — not only based on Knight, but also the University of Pennsylvania v. EEOC, in which the Court held that even assuming that there is a right to academic freedom, it governs only content. There, just as here, the plaintiffs alleged that — that the government policy was clear and said there is no right to that. And so what — what the University of Pennsylvania v. EEOC stands for is that academic freedom, to the extent it exists at all, does not exempt individual professors from generally applicable laws and regulations, such as the campus carry law and policy. So really, when everything is sorted out here, it comes down to the fact that these professors are not happy with what they perceive to be the situation in the classrooms at the University of Texas arising from this campus carry policy. So it sort of comes down to the next good offer from Yale or Tulane, just take it. I mean, doesn't that really — isn't that sort of where you're left? As in — as in any employment policy, Your Honor. If you don't like the policies, then — You need to find a better venue. Right. But what you — but coming — coming to court to try to change those policies is exactly what this Court has said it does not want to get involved in. And then if I could — if I could briefly talk about the Second Amendment and equal protection claims. The Second Amendment claim claims a broad-based right to self-defense that entitles plaintiffs to a certain level of regulation of gun possession in the state of Texas. And plaintiffs rely on the prefatory clause of the Second Amendment for this supposed right. But Heller was crystal clear that the prefatory clause does not expand or limit the right to bear arms. And that's what the right is. After all, it's the right to bear arms. And in McDonald, the Court was crystal clear that when it incorporated that right through the 14th Amendment, it was incorporating only the right to bear arms, not the right to a certain level of regulation of gun possession. Counsel, do you have any explanation for why Judge Yackel's opinion is written in the way it does, where he resolves the First Amendment issue, Amnesty International, Laird, whatever else he cites, says what he says about traceability and then dismisses, never deals with these other issues? Were they not, you know, maybe not central to the — as central to the case? Do you read this as his interpretation that what he held actually deals with the other issues? Or were they — just how did this play out in the district court that the opinion was prepared this way, if you have any explanation? I don't have any specific explanation as to why it was prepared this way. There were two motions to dismiss in — filed in the district court, one on behalf of defendants, and the Paxton motion to dismiss was purely merits, and the UT motion to dismiss was merits and jurisdiction. And in the opinion, the court says he's granting both motions, and he goes on to dismiss all claims. And so, you know, there are — but he only talks specifically about First Amendment standings, so there are — there are conflicting signs there. But ultimately, Federal Rule 52, I believe it is, does not require findings of fact or conclusions of law in the granting of a 12B motion, and so that's no basis to reverse the court. And in any event, it's an over-review, so no matter what the district court said, this court would have to look at the complaint and see if plaintiffs have alleged a claim, which they have not. Can I ask one question? Of course. The — does this policy also cover — for example, let's say the university, the law school, invites an extremely controversial national figure to come deliver one of their addresses at the law school. It also would — the students would be able to come and carry guns at this event, too? Your Honor, that's the — the default would be yes. You know, as far as what's in the record here, I don't know what to point you to specifically except that — except that this case involves exclusively the classrooms. And I know that there are various parts of the university that are — Yeah, you're talking about maybe the auditorium or whatever. — that are rolled off. So the male whatever room. Yeah, and there are — there are other things. So in any event where there's going to be young children, for example, no guns are allowed. So there are various things that could play into that. The ultimate goal of this was to look at where students who have the privilege to carry, where they spend most of their time. Because if they're prevented from carrying guns where they spend most of their time, then there's not much left to their privilege. And so that's why classrooms are such a focus here, because that's the main point of going to school, and that's where students spend most of their time. And that kind of dovetails with the equal protection argument, which is that there are good rational reasons for each step in this policy. Plaintiffs' only response is that, well, we should be able to prove that these things aren't rational. But as in any other case, you have to allege facts before you get to discover evidence and bring it into court. And plaintiffs have not alleged any fact that, if true, would undermine the rationality of the campus carry law and policy. And so for that reason, that claim must fail as well. And with that, I will return my time. Thank you. All right. In law school, I had a professor who did not allow students to bring in laptops. If a student had went ahead and brought that laptop, I assume the professor should sue the student, not the university. I don't know, Your Honor. I guess what I'm trying to get at is – go ahead. It would seem to me – and some of these professors do have policies about bringing electronic gadgets into the classroom. And it would seem to me that they would say, I'm asking you not to do it. You're excused from class. The student could complain, saying, I have a right to do that or whatever. That's the way – it is well recognized that they don't own the classroom. But professors are largely in charge of what goes on in the classroom. And so I don't think this is a situation of these people being high-handed and saying, we're special. They are special in terms of the academic freedom doctrine, which is alive and well, notwithstanding the reference to the EEOCV Pennsylvania, the 1967, I think it is, decision establishes academic freedom as a First Amendment principle. This court in the Kingsville vs. – a Kingsville ISD case talking about a high school said classroom discussion is protected First Amendment activity. So it's there. Let me mention a few things. Is there an example of giving standing to somebody to sue the government because the government hasn't protected you against a third party? It seems to me that's basically what you're saying. No, you can't do that because that situation – they aren't asking for government protection. They're asking for self-protection. They're saying we should have the option. It's the opposite of the government protecting them. It's the government not allowing them to protect themselves. They're professors and they're saying we want to exclude guns from our classroom, not other people's classrooms, ours. And the government has said we won't let you. You have to let a loaded gun into your classroom. Well, under that theory, Texas has concealed carry statewide. Does any Texan have the standing to sue the government for not preventing people from carrying concealed throughout the state? Not at large, but these people teach. They have factual allegations supported by university president, the faculty council, and others, including the working group that set up the policy, saying you're right. This will have an impinging effect on academic freedom. So if I walk out and say I don't like it because my brother who drives a train is walking by me and packs heat, I don't know if it's a First Amendment problem for me. It's a First Amendment problem for the professors because their classroom activity is protected by the First Amendment. And I want to go to Judge King's question. You can make that point about the statewide policy. I want to go to a park and express my views about a particular political matter, but you're letting people carry guns not just in universities but across the entire state. I don't want guns there, so instead of suing the person bringing a gun, I'm going to sue the state. But you're an undifferentiated part of the whole. Here you aren't undifferentiated. I'm a speaker. Not everybody wants to speak at the park, but I do. Well, if you're speaking, it may be different. Okay. So then a person can challenge the state's concealment? We're not challenging everything. We're challenging one thing. And we only have to establish it's we're only asking for standing to protect our case. I understand, but it's natural for us to be worried about the natural logic of your standing. Right, but I don't think the natural logic carries that far. And why not? Because it has to be a specific situation where somebody has support and it has to be objectively reasonable. But I think I've given you one. I'm not trying to waste your time, but I've given you a specific situation. I want to speak at a park. I fear that because the state allows concealed carry statewide, somebody's going to bring a gun and show my ability to speak. I think you just have to embrace the principle that you'd have standing there, too, under your theory. Well, I just don't know, honestly, Your Honor. I don't think it's a situation like Judge King was saying, I could love it or leave it. If you don't like the policy, go somewhere else. Because we don't have a rule in this country that says if your First Amendment rights are being impinged upon, just leave and go somewhere where they aren't being. Well, we may be moving in that direction. That's true. Sorry. That's true. I understand, Your Honor. Judge Ho, you asked about layered. I didn't have time to read the whole opinion, but I can say this. Mies, which Judge Southwick mentioned, is the case that specifically distinguishes what I think is our situation from the situation in layered. It said there, where they didn't have standing in layered, it was undifferentiated bystanders with claims indistinguishable from those of the general public. These people are not the general public. Also in layered, what the Court said it had before it is they had the mere existence without more of a governmental surveillance policy. Here we have more. I just want to briefly mention this. Give him one more minute, Kim. Say it, Your Honor. Your time's up. I said give you one more minute. Okay. The state mentioned history in NAACP and distinguished it from here. We have fresh history, unfortunately, here. Guns have killed people in classrooms, have killed professors in classrooms. In Texas, in Florida, at Virginia Tech, it is not a crazy idea to think you have to be worried the lieutenant governor of Texas wants to put metal detectors in every school in Texas. These kinds of concerns are not undifferentiated. They're specific to these people, but they're also objectively reasonable based on everything that's going on that we've seen out there, and history is fresh in this regard. Thank you, Your Honor. All right, counsel. Thank you both. It's an important case, and we will give it our close attention.